IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:09-CV-479-FL

| | | |
|---|---|---|
| PEACE COLLEGE OF RALEIGH, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| AMERICAN INTERNATIONAL SPECIALTY | ) | |
| LINES INSURANCE COMPANY and | ) | |
| CHARTIS CLAIMS, INC., formerly known as | ) | |
| AIG Domestic Claims, Inc., | ) | |
| | ) | |
| Defendants. | ) | |

This matter comes before the court on cross-motions for partial summary judgment filed by plaintiff Peace College of Raleigh, Inc. (DE # 14) and defendants American International Specialty Lines Insurance Company ("AISLIC") and Chartis Claims, Inc. ("Chartis") (DE # 18).[1] The issues raised in these motions have been fully briefed and now are ripe for adjudication. For the reasons that follow, the court grants plaintiff's motion and denies defendants' motion.

## STATEMENT OF THE CASE

This declaratory judgment action, originally filed in Wake County Superior Court on October 1, 2009, was removed to this court by defendants on November 4, 2009. According to the complaint, defendant AISLIC is the issuer, with defendant Chartis its authorized representative, of an insurance policy that obligates it to pay on behalf of plaintiff any loss as a result of a claim for bodily injury, property damage, or clean-up costs resulting from pollution conditions. The policy

---

[1] Also pending is plaintiff's motion to strike defendants' reply to their motion for partial summary judgment or, in the alternative, for leave to file a sur-reply (DE # 22). For good cause shown, plaintiff is ALLOWED leave to file its proposed sur-reply. The court accordingly will consider all arguments raised in both the reply and sur-reply.

also requires defendants to defend plaintiff against any such claim. Defendants, however, have refused to defend or indemnify plaintiff against claims for contribution towards pollution clean-up costs in a lawsuit ("the CERCLA Action") filed against plaintiff pursuant to the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 et seq. Plaintiff seeks a declaration that defendants have a duty to defend and indemnify it in the CERCLA Action as well as any claim made in the future arising from the same underlying facts.

On February 25, 2010, plaintiff moved for partial summary judgment, seeking a declaration that defendants have a duty to defend plaintiff against the claims and cross-claims asserted against it in the CERCLA Action. Plaintiff asks for a judgment indicating that defendants have an obligation to reimburse plaintiff for defense costs already incurred and to assume its defense going forward. On April 23, 2010, defendants responded in opposition and filed their own motion for partial summary judgment, asking the court to find that they have no obligation to defend plaintiff under the policy as a matter of law. Plaintiff responded on May 17, 2010, and defendants replied May 27, 2010. On June 4, 2010, plaintiff filed a proposed sur-reply, which was allowed by the court as set forth above.

## STATEMENT OF THE FACTS

Plaintiff, a non-profit corporation affiliated with the Presbyterian Church, operates a women's liberal arts college in Raleigh, North Carolina. (Compl. ¶ 2.) On March 1, 2006, defendant AISLIC issued a Commercial Pollution Legal Liability Policy, Policy No. PLC 1952109 ("the Policy"), to plaintiff and other church-affiliated colleges through Educational and Institutional Insurance Administrators, Inc., a non-profit company that secures various insurance products for

church-affiliated higher education institutions. (See Policy, Pl.'s Ex. 1; Roskopf Decl., Pl.'s Ex. 2 at ¶ 1.) Pursuant to the Policy, AISLIC agreed:

> [t]o pay on behalf of the Insured, Loss that the Insured is legally obligated to pay as a result of Claims for Bodily Injury, Property Damage or Clean-Up Costs resulting from Pollution Conditions, provided such Claims are first made against the Insured and reported to the Company, in writing, during the Policy Period, or during the Extended Reporting Period if applicable.

(Policy at ¶ I.A.) The Policy further states that AISLIC has "the right and the duty to defend any Claims covered under [the relevant provision of the Policy]." (Id. at ¶ I.B.) The "Policy Period" as defined in the Policy was March 1, 2006, through March 1, 2008. (Id. at p. 1.)

On March 16, 2007, plaintiff was notified by letter from Consolidation Coal Company ("Consol") that Consol intended to pursue a contribution claim against it under CERCLA for clean-up costs associated with the Ward Transformer Superfund Site ("the Ward Site"). (Darragh Letter to Bingham, Pl.'s Ex. 4.) The letter informed plaintiff that Consol and certain other parties had agreed with the Environmental Protection Agency ("EPA") to fund a removal action at the Ward Site to clean up contamination caused by polychlorinated biphenyls ("PCBs") allegedly leaked from transformers stored at that location. (Id.) Plaintiff is alleged to have engaged in one or more transactions with the Ward Transformer Company ("Ward"), the owner of the site, whereby PCB-containing transformers were sent to Ward by plaintiff. (Id.)

On April 11, 2007, within the Policy Period, plaintiff notified defendants of Consol's claim by completing a Notice of Loss / Notice of Claim form. (Notice of Claim, Pl.'s Ex. 5.) Plaintiff then obtained from Consol copies of Ward records regarding eight transformers plaintiff had sent to Ward. (See Pl.'s Exs. 7-13.) According to those records, plaintiff sent one transformer to Ward in 1983, which Ward reconditioned and re-sold later that year. (Pl.'s Ex. 6.) The records also indicate

that plaintiff sent seven transformers to Ward in 1995 on consignment for resale and that Ward eventually resold all seven transformers, the last in June 2001. (Pl.'s Exs. 7-13.) In July 2008, upon receiving these records, plaintiff forwarded them to Chartis.[2] (Johnson Letter to Lynch, July 15, 2008 and Johnson Letter to Lynch, July 29, 2009, Pl.'s Ex. 14.)

By letter dated August 7, 2008, Chartis – as the authorized representative of AISLIC – notified plaintiff that it was entitled to defense under the Policy, under a reservation of rights with respect to coverage for any loss plaintiff might become legally obligated to pay Consol. (Lynch letter to Barfield, Pl.'s Ex. 15.) However, by subsequent letter dated December 15, 2008, Chartis notified plaintiff that it was denying coverage to plaintiff for Consol's claim and withdrawing its commitment to defendant plaintiff against the same. (Redd letter to Barfield, Pl.'s Ex. 16.) Chartis denied coverage based on Exclusion O of the Policy, which excludes coverage for any loss "arising from the Insured's Products after possession of such Insured's Products have been relinquished to others by the Insured or others trading under its name." (Id. (quoting Policy at ¶ II.O).)

On April 30, 2009, Consol amended its complaint in the CERCLA Action, naming plaintiff herein as a defendant in that action. See Amended Complaint, Consolidation Coal Co. v. 3M Co., et. al., No. 5:08-CV-463-FL (E.D.N.C. Apr. 30, 2009).[3] Consol claims that plaintiff is liable for contribution towards Consol's costs incurred pursuant to its agreement with the EPA. Id. After plaintiff provided Chartis with a copy of Consol's amended complaint, Chartis reaffirmed its decision to deny coverage under the policy. (Redd letter to Johnson, Pl.'s Ex. 17.) In addition to

---

[2] Defendant Chartis was at that time known as AIG Domestic Claims, Inc. However, the court uses "Chartis" throughout this order, even regarding periods when that company was known as AIG Domestic Claims, Inc., for simplicity's sake.

[3] Consol has since further amended its complaint in the CERCLA action. See Second Amended Complaint, Consolidation Coal Co. v. 3M Co., et al., No. 5:08-CV-463-FL (E.D.N.C. Sept. 1, 2009).

4

Exclusion O, Chartis contended that coverage would be denied under Exclusion C, which excludes from coverage loss "arising out of Waste Disposal Activities which took place prior to [July 1, 1998]." (Policy at ¶ II.C; Redd letter to Johnson.) Chartis contended that, according to the records provided by Consol, each of the transformers at issue was sent to Ward by plaintiff prior to July 1, 1998. (Pl.'s Exs. 6-13; Redd letter to Johnson.)

Because the allegations against plaintiff in the CERCLA Action are material to the instant lawsuit, they are set forth in relevant part as follows:

> 150. Beginning in approximately 1964, the [Ward Site], consisting of approximately 11 acres, was developed for use as a transformer repair, reconditioning, rebuilding, manufacturing and sales facility. From approximately 1965 through 2006, that facility was used for those purposes . . . .
>
> * * * *
>
> 153. During its operations at the Ward Site, . . . Ward acquired transformers from third parties who, directly or indirectly, sought to get rid of old, used, unwanted, defective, leaking, damaged, obsolete and/or excess oil filled transformers containing dielectric fluid with some concentration of PCBs. Ward stored those transformers out in the open in the backyard at the Ward Site until Ward found a purchaser desiring a rebuilt or reconditioned transformer, and, to fill the purchaser's order, Ward then selected a transformer that could be serviced, repaired, rebuilt, or reconditioned to meet the customer's specifications. In some instances, Ward rebuilt the selected transformer to different voltage ratings and different configurations. In some instances, Ward scavenged parts from one transformer to use in repairing or rebuilding another transformer. Some transformers were scrapped. During a certain period of the Ward operations, Ward reclaimed the copper and/or aluminum windings and the iron core from some transformers. In many instances, before selling a reconditioned and/or rebuilt transformer, Ward removed the dielectric fluid containing PCBs and replaced it with new non-PCB dielectric fluid, necessitating the disposal of the removed fluid. In acquiring these transformers, Ward typically paid scrap value for them.
>
> Ward [also] took old, used, unwanted, defective, leaking, damaged, obsolete or excess transformers on consignment from third parties to be held in storage in the Ward backyard until Ward found a prospective purchaser and then Ward reconditioned, repair or rebuilt the transformer to meet the purchaser's requirements

5

and sold it. In many instances, Ward removed the dielectric fluid containing PCBs and replaced it with a non-PCB dielectric fluid necessitating the disposal of the removed fluid. The consignor retained title to the transformer until it was sold.

154. The defendants who, directly or indirectly, "sold" and/or consigned transformers to Ward were not in the business of manufacturing transformers and/or in business of selling transformers to end users. Those defendants were users of the subject transformers and had determined that they no longer had any use for the subject transformers, and they were seeking to get rid of the transformers. Ward did not purchase any of the subject transformers for use in the electrical service at the Ward Site, and Ward did not put the transformers to any such use at the Ward Site. In many instances, the transformers, when acquired by Ward, were missing component parts, components were broken, the transformer could not function because of defects in or damage to the core and coil, the dielectric fluid had lost its needed characteristics, and/or some part of the dielectric fluid had been removed, and, as a result, the transformers were inoperable.

155. Notwithstanding some defendants' efforts to drain the dielectric fluid containing PCBs from their transformers before sending them to the Ward Site and to separately dispose of those fluids, some amount of dielectric fluid with PCBs remained in the transformers when the transformers were received at the Ward Site.

156. The parties "selling" the transformers sold them as scrap and/or "as is" with no warranties; they were sometimes sold at auction where the bidders included scrap dealers, and the transformers were sold without regard for or limitation on what Ward or any other purchaser intended to do with the transformers.

157. The parties who consigned transformers to Ward did so in an "as is" condition with no warranties and with no restrictions on what Ward could do to the transformers.

* * * *

169. [F]or essentially every transformer rebuilt or reconditioned and/or sold [after 1981], Ward removed the dielectric fluid from such transformers and replaced it with "new" or previously used non-PCB (<50 ppm) dielectric fluid for the purpose of characterizing such transformers as rebuilt non-PCB transformers. Ward also removed dielectric fluid because it no longer exhibited acceptable dielectric properties. In the process of changing or replacing the dielectric fluids, PCBs were spilled, leaked or otherwise released into the environment at the Ward Site. In addition, Ward accumulated large volumes of dielectric fluids containing PCBs at various concentrations. Defendants doing business with Ward knew and/or should

have known that Ward's practice was to remove the dielectric fluid from essentially all transformers sent to Ward, whether for repair or as a "sale" or on consignment.

170. During the course of its transformer servicing, repair, rebuilding, reconditioning, salvaging and scrapping operations at the Site, Ward removed transformer oils, at least in part, by pouring or pumping the oil into aboveground storage tanks or into 55 gallon drums or other containers for storage and subsequent treatment by filtration and/or for disposition. Further, Ward removed the core and coil assemblies to which PCB fluids still adhered and took the core and coil assemblies into the transformer building for rewinding or other rebuilding. Transformers that were stored in the yard awaiting servicing, repair, rebuilding and/or reconditioning, and resale or scrapping typically contained dielectric fluid with various concentrations of PCBs. At least during some period of Ward's operations, Ward power-washed all transformers upon receipt at the Site in order to clean the outside surfaces of the transformers, including the removal of any PCBs that adhered to those surfaces due to sweat leaks or other releases. Power washing was done in the loading/receiving dock area, and the contaminated wash water was allowed to drain off the dock and across the ground surface toward a drainage ditch along the southern side of the property.

171. As a result of the receipt, reconditioning, servicing, disassembly, salvaging, repair and rebuilding of transformers with PCB-containing dielectric fluids, the power washing of transformers, and the storage of transformers, PCBs were leaked, spilled or otherwise released onto the floor of the transformer repair area and into drains leading into the ground, PCBs were tracked outside and PCBs were otherwise released into the soil and surface waters at the Ward Site with the result that PCBs entered the environment at the Ward Site.

(Consol's Second Amended Complaint ¶¶ 150, 154-57, 169-71, Pl.'s Ex. 18.) The complaint does not state how many transformers were sent to Ward by plaintiff, nor when they were sent.

Based on these allegations, Consol contends that plaintiff is liable under § 107(a)(2) of CERCLA as the owner or operator of a "facility" (i.e., a transformer) at the time hazardous substances (i.e., PCBs) were released at that facility; and is liable under § 107(a)(3) of CERCLA because it arranged for the disposal or treatment of hazardous substances (i.e., PCBs) at the Ward Site. (Id. ¶¶ 199-200.) Consol seeks to hold each defendant in the CERCLA Action, including plaintiff here, jointly and severally liable for past and future environmental response costs incurred

by Consol at the Ward Site, and also seeks a judgment that each defendant, including plaintiff here, is liable for its equitable share of the response costs incurred plus any costs reimbursed to the EPA.[4] (Id. at p. 50.) On September 15, 2009, PCS Phosphate, Inc. ("PCS Phosphate") asserted cross-claims against all defendants in Consol's CERCLA Action, including plaintiff here, alleging that it is already contributing to the removal action, and setting forth allegations against plaintiff that are substantially similar to those set forth by Consol. (See PCS Phosphate Cross-Claims, Pl.'s Ex. 19.)

**DISCUSSION**

A.   Standard of Review

The court will grant summary judgment on all or part of a claim where the pleadings, the discovery and disclosure materials on file, and any affidavits show that there exists no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the initial burden of coming forward and demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the non-moving party then must affirmatively demonstrate that there exists a genuine issue of material fact requiring trial. Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). "The evidence, and all inferences drawn from the facts, must be viewed in the light most favorable to the non-moving party." Id. at 586.

In determining whether an insurer has an obligation to defend an insured against a lawsuit, North Carolina law dictates that the court apply the "comparison test," whereby the court reads the

---

[4] Consol also seeks the costs incurred by Basset Furniture Industries, which entered into the agreement with the EPA and assigned its cost recovery claims to Consol. (See Consol's Second Amended Complaint ¶ 190, 206.)

insurance policy and the complaint side-by-side to determine whether the events as alleged are covered or excluded.[5] Harleysville Mut. Ins. Co. v. Buzz Off Insect Shield, LLC, 364 N.C. 1, 6, 692 S.E.2d 605, 610 (2010) (citing Waste Mgmt. of Carolinas, Inc. v. Peerless Ins. Co., 315 N.C. 688, 693, 340 S.E.2d 374, 378 (1986)). "[T]he interpretation of an insurance policy provision is a question of law." ABT Bldg. Prods. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 472 F.3d 99, 115 (4th Cir. 2006) (applying North Carolina law). Accordingly, where the language of the insurance policy and of the complaint are undisputed, the question of whether the insurer has an obligation to defend the insured against that complaint is appropriately decided upon cross-motions for summary judgment. See, e.g., Waste Mgmt. of Carolinas, 315 N.C. at 690-91, 340 S.E.2d at 377.

B.  Analysis

"Generally speaking, the insurer's duty to defend the insured is broader than its obligation to pay damages incurred by events covered by a particular policy." Waste Mgmt. of Carolinas, 315 N.C. at 691, 340 S.E.2d at 377. This is so because "[a]n insurer's duty to defend is ordinarily measured by the facts as alleged in the pleadings; its duty to pay is measured by the facts ultimately determined at trial." Id. If the pleadings "state facts demonstrating that the alleged injury is covered by the policy, then the insurer has a duty to defend, whether or not the insured is ultimately liable." Id. It is only "when the pleadings allege facts indicating that the event in question is not covered, and the insurer has no knowledge that the facts are otherwise, [that] it is not bound to defend." Id.;

---

[5] Because the court's jurisdiction over this action is premised on diversity of citizenship, it applies the choice of law rules of the forum state. CACI Int'l, Inc. v. St. Paul Fire & Marine Ins. Co., 566 F.3d 150, 154 (4th Cir. 2009). Under North Carolina law, interpretation of an insurance contract is determined by the law of the place where it was made. Roomy v. Allstate Ins. Co., 256 N.C. 318, 322, 123 S.E.2d 817, 820 (1962). The North Carolina legislature has determined that "[a]ll contracts of insurance on property, lives, or interests in this State shall be deemed to be made therein, and all contracts of insurance the applications for which are taken within the State shall be deemed to have been made within this State and are subject to the laws thereof." N.C. Gen. Stat. § 58-3-1. Thus, interpretation of the Policy is governed by North Carolina law.

see also Builders Mut. Ins. Co. v. N. Main Constr., Inc., 361 N.C. 85, 88, 637 S.E.2d 528, 530 (2006) ("An insurer's duty to defend a policy holder against a lawsuit is determined by the facts alleged in the pleadings."); Crandell v. Am. Home Assurance Co., 183 N.C. App. 437, 440, 344 S.E.2d 604, 606 (2007) (noting that the "mere possibility" that potential liability is covered suffices to impose duty to defend on insurer).

Under North Carolina law, "[t]he primary goal [of the court] in interpreting an insurance policy is to discern the intent of the parties at the time the policy was issued." Register v. White, 358 N.C. 691, 695, 599 S.E.2d 549, 553 (2004). A policy with plain and unambiguous terms will be enforced according to those terms, and a policy with terms that are uncertain or capable of several interpretations will be construed in favor of the policyholder. Id.; see also St. Paul Fire & Marine Ins. Co. v. Vigilant Ins. Co., 919 F.2d 235, 240 (4th Cir. 1990) ("[U]nder North Carolina law, any doubts are to be resolved in favor of coverage, and the insurer avoids its duty to defend only if 'the facts are not even arguably covered by the policy.'" (citation omitted)). Nontechnical words are given the same meaning they usually receive in everyday speech unless the context dictates otherwise. Grant v. Emmco Ins. Co., 295 N.C. 39, 42, 243 S.E.2d 894, 897 (1978). However, "[i]f a policy defines a term, then that meaning is to be applied regardless of whether a broader or narrower meaning is customarily given to the term . . . ." Nationwide Mut. Ins. Co. v. Mabe, 342 N.C. 482, 492, 467 S.E.2d 34, 40 (1996) (internal quotation marks omitted).

The parties agree that if no exclusion applies, defendants have a duty a defend plaintiff in the CERCLA Action because Consol and PCS Phosphate seek "Clean-Up Costs resulting from Pollution Conditions" as covered by the Policy because they assert that plaintiff is liable under a federal environmental law for contribution towards clean-up costs relating to the leak of toxic PCBs into soil

and groundwater.[6] However, defendants assert that the injuries alleged are excluded under provisions governing "Prior Waste Disposal Activities," "Abandoned Property," and "Products Liability," and that as such there is no duty to defend in this case.

Because the complaint alleges facts in support of two distinct theories of liability, both of these theories must be excluded from coverage for there to be no duty to defend. See Waste Mgmt., 315 N.C. at 691, 340 S.E.2d at 377 n.2 ("[A]llegations of facts that describe a hybrid of covered and excluded events or pleadings that disclose a mere possibility that the insured is liable . . . suffice to impose a duty to defend upon the insured."). Moreover, the applicability of any exclusion must be apparent from the allegations of the pleadings alone; the court will not look to evidence outside the four corners of the pleadings to determine whether an exclusion applies. See St. Paul Fire & Marine Ins. Co. v. Vigilant Ins. Co., 724 F. Supp. 1173, 1179 (M.D.N.C. 1989) (holding that "an insurer may not exonerate itself by preliminarily determining that no coverage actually exists despite the allegations of the complaint" and that "a preliminary investigation may only impose a duty to defend where none is clearly imposed by the allegations of the complaint"), aff'd, 919 F.2d 235 (4th Cir. 1990).[7] With these principles in mind, the court turns to its analysis of the exclusions.

---

[6] As defined by the Policy, "Clean-Up Costs" include "reasonable and necessary expenses . . . for the investigation, removal, remediation including associated monitoring, or disposal of soil, surfacewater, groundwater or other contamination to the extent required by Environmental Laws . . . [including costs] actually incurred by . . . third parties." (Policy at ¶ VIII.C.) "Pollution Conditions" include "the discharge, dispersal, release, or escape of any solid, liquid, gaseous or thermal irritant or contaminant, including . . . toxic chemicals . . and waste materials[,] into or upon land . . . or any watercourse or body of water, including groundwater . . . ." (Policy at Endorsement 5.)

[7] Defendant cites Waste Management of Carolinas, 315 N.C. 688, 340 S.E.2d 374, for the proposition that "an insurer has no duty to defend when . . . [a complaint] contains no allegation that would preclude application of the exclusion and . . . facts developed through investigation . . . demonstrate that the exclusion bars coverage for the insured's claim." (Defs.' Mem. Supp. Summ. J. 13.) In Waste Management, the North Carolina Supreme Court noted that "[w]here the insurer knows or could reasonably ascertain facts that, if proven, would be covered by its policy, the duty to defend is not dismissed because the facts alleged in a . . . complaint appear to be outside coverage, or within a policy exception to coverage." 315 N.C. at 391, 340 S.E.2d at 377. The court stated that the lax "notice pleading"
(continued...)

1.   Prior Waste Disposal Activities

Excluded from coverage is any loss "arising out of Waste Disposal Activities which took place prior to [July 1, 1998]." (Policy at Endorsement 4.) "Waste Disposal Activities" is defined as "the transportation, processing, treatment or disposal, or the arranging for the transportation, processing, treatment or disposal of [plaintiff's] waste." (Policy ¶ VIII.U.)  Consol and PCS Phosphate's claim that plaintiff is liable under § 107(a)(3) of CERCLA because it arranged for the disposal or treatment of PCBs at the Ward Site meets the definition of "Waste Disposal Activities," but there is no indication in the CERCLA Action pleadings as to when the disposal or treatment occurred.  Accordingly, this exclusion does not apply.[8]

---

[7](...continued)
standard imposes upon an insurer "a duty to investigate and evaluate facts expressed or implied in [the] complaint." Id. at 392, 340 S.E.2d at 378.  However, the court pointedly noted that the purpose of this duty "is not to free the carrier from its covenant to defend, but rather to translate its obligation into one to reimburse the insured if it is later adjudged that the claim was one within the policy covenant to pay." Id. at 691-92, 340 S.E.2d at 378.

Waste Mangement itself was a reasonably straightforward application of this doctrine, although the court ultimately found no duty to defend based on the pleadings and the additional investigation.  The insured in Waste Management was alleged to have disposed of solid wastes over a six year period in a landfill.  315 N.C. at 692, 340 S.E.2d at 392.  The policy excluded from coverage any damage stemming from the discharge or release of waste materials except for a discharge or release that was "sudden and accidental." Id. at 693-94, 340 S.E.2d at 379.  The court noted that "[t]he facts alleged in the pleadings . . . describe the 'contribution' over a number of years of contaminating materials to a landfill, eventually rendering groundwater beneath it hazardous for human consumption and other uses." Id. at 700, 340 S.E.2d at 382-83.  After the insurer engaged in some additional investigation in the form of a deposition, the court agreed that "the events alleged in the pleadings and supported by the deposition fit squarely within the language of the exclusion clause." Id. at 700, 340 S.E.2d at 374.

In sum, with respect to exclusions in an insurance policy, the rule in North Carolina is that an insurer has a duty to defend an insured unless (1) the exclusion applies based on the pleadings themselves and (2) additional investigation does not lead to a contrary conclusion.  The inverse rule proposed by defendant that there is a duty to defend unless (1) the pleadings do not rule out application of the exclusion and (2) additional research demonstrates that the exclusion does apply, is not supported by the case law.  As the North Carolina Supreme Court has noted, "[t]he difference in scope between the duty to defend and the duty to indemnify is based on the source of the factual narrative." Harleysville Mut. Ins. Co., 364 N.C. at 7, 692 S.E.2d at 611.  The "factual narrative" that is relevant here is the pleadings, not any other material known to the parties.

[8] Although the undisputed records provided by plaintiff to defendants prior to the CERCLA Action state that plaintiff sent eight transformers to Ward before July 1, 1998, these facts were not alleged in the complaint and have not been found by the trier of fact to be true in the CERCLA Action.

12

The fact that the pleadings do not allege when plaintiff's transformers were sent to Ward (not to mention when those transformers are alleged to have leaked PCBs) also dictates that the exclusion does not apply to the § 107(a)(2) claim that plaintiff is liable as the owner or operator of a "facility" at the time PCBs were released thereat. But even if the pleadings did provide a relevant date, the facility claim does not "arise out of" plaintiff's alleged disposal and transportation to Ward. "An injury 'arises out of' an excluded source of liability when it is proximately caused by that source." Builders Mut. Ins. Co., 361 N.C. at 88, 637 S.E.2d at 530. "Waste Disposal Activities" did not "proximately cause" the injury alleged in the facility claim (i.e., the release of PCBs) because such transport or disposal was not necessarily "a cause which in natural and continuous sequence, unbroken by any new and independent cause, produced the [injury] . . . ." Hairston v. Alexander Tank & Equip. Co., 310 N.C. 227, 233, 311 S.E.2d 559, 565 (1984). As alleged by the complaint, the release was proximately caused by the "receipt, reconditioning, servicing, disassembly, salvaging, repair and rebuilding of transformers with PCB-containing dielectric fluids, the power washing of transformers, and the storage of transformers" at the Ward Property. (Consol's Second Amended Complaint ¶ 171.)

2.  Abandoned Property

Also excluded from coverage is any loss "arising from Pollution Conditions at any property owned, leased, rented or occupied by [plaintiff], which [plaintiff] sold, leased, gave away, abandoned or relinquished operational control of prior to [March 1, 2006]." In the CERCLA Action, plaintiff is alleged to have consigned transformers to Ward before 2006 "in an 'as is' condition with no warranties and with no restrictions on what Ward could do to the transformers." (Consol's Second Amended Complaint ¶ 157.) Plaintiff is alleged to be liable under § 107(a)(2) as the owner or

13

operator of the consigned transformers at the time PCBs were released thereat. Defendants argue that they therefore have no duty to defend this claim because plaintiff allegedly relinquished control of the transformers prior to 2006 and that the pollution occurred at this property. Plaintiff, by contrast, contends that the exclusion only applies to real property and as such defendants maintain the duty to defend against this claim.

"Facility" is defined under CERCLA to include not only real property but also such things as equipment, pipes, and storage containers. See 42 U.S.C. § 9601(9). However, the definition of "property" in the Policy is not governed by the definition of "facility" under CERCLA; instead, absent a specific definition in the Policy, "property" is given its everyday meaning in context. See Grant, 295 N.C. at 42, 243 S.E.2d at 897. If the meaning of the term "property" as used in the Policy is uncertain or is capable of several interpretations, it will be defined in a way that favors coverage rather than exclusion. See Register, 358 N.C. at 695, 599 S.E.2d at 553.

When placed in context, and construing any ambiguity in favor of coverage, the court agrees that the word "property" in the "Abandoned Property" exclusion is better read to refer only to real property. Specifically, it appears that the "Abandoned Property" exclusion refers to a separate coverage provision not invoked by plaintiff here, under which the Policy covers "Clean-Up Costs resulting from Pollution Conditions on or under the Insured Property." (Policy ¶ I.A.) "Insured Property is defined as "real property owned, leased, rented or occupied by [plaintiff]." (Id. ¶ VIII.J.) Although the abandoned property exclusion does not include the word "real" in front of property, it uses the same description of such property (i.e., "owned, leased, rented, or occupied by [plaintiff]). (See Policy ¶ II.L.) Similar phrasing is used in the "Acquired Property" exclusion, under which coverage at any property that plaintiff "first acquires, leases, rents or occupies" after a certain date

14

is excluded. (Id. ¶ II.K.) Although the term "Insured's Property" is not used in these exclusions, the wording used (i.e., "property owned, leased, rented or occupied by the insured) demonstrates an attempt to refer to the same concept.

The conclusion that this exclusion applies only to plaintiff's real property is further bolstered by the fact that the relevant date for which the exclusion applies differs from that applying for the "Prior Waste Disposal Activities" exclusion. As mentioned, coverage is excluded for prior waste disposal activities occurring prior to July 1, 1998; coverage is excluded at properties abandoned before March 1, 2006. If the exclusion is read to include not only real property but also chattel such as transformers, then the Policy would purport to cover chattel that was disposed of as waste after July 1, 1998, but would not cover chattel that was "abandoned" before March 1, 2006. This internal inconsistency dictates finding in favor of the insured.

3. Products Liability

Finally, in an exclusion titled "Products Liability," the Policy excludes from coverage losses "arising from the Insured's Products after possession of such Insured's Products have been relinquished to others by [plaintiff] or others trading under its name." (Policy ¶ II.O.) "Insured's Products" in turn is defined as:

> goods or products manufactured, sold, handled or distributed by [plaintiff] or others trading under [its] name, and includes containers (other than automobiles, rolling stock, vessels or aircraft), materials, parts or equipment furnished in connection therewith, and includes warranties or representations made at any time with respect to the fitness, quality, durability, performance or use thereof, or the failure to provide warnings or instructions.

(Id. ¶ VIII.I.)

The pleadings in the CERCLA Action allege that plaintiff sold at least one transformer and consigned at least one transformer to Ward. (Consol's Second Amended Complaint ¶¶ 181-82.) Defendants argue that this indicates that plaintiff "sold" and/or "handled" the transformers, and that this is sufficient to demonstrate that the transformers constitute plaintiff's "products" for purposes of the exclusion. Plaintiff, on the other hand, notes that the complaint alleges that plaintiff was "not in the business of manufacturing transformers and/or in business of selling transformers to end users" but rather was a "user[] of the subject transformers and had determined that [it] no longer had any use for the subject transformers, and . . . [was] seeking to get rid of the transformers." (Id. ¶ 154.) Plaintiff urges the court to find that the exclusion does not reach used or surplus equipment sold on an incidental basis by an entity not engaged in a regular course of selling such equipment.

In support of their respective positions, each party has provided citations to cases from other jurisdictions.[9] Rather than rely on these cases, none of which purport to apply North Carolina law or involve the type of pollution liability insurance policy at issue here, the court construes the exclusion by once again giving terms their everyday meaning in the context of the Policy while resolving any ambiguities in favor of plaintiff as the insured. See Register, 358 N.C. at 695, 599 S.E.2d at 553; Grant, 295 N.C. at 42, 243 S.E.2d at 897.

---

[9] Compare Landress Auto Wrecking Co. v. U.S. Fidelity & Guar. Co., 696 F.2d 1290, 1293 (11th Cir. 1983) (rejecting argument that similar language included only those items routinely sold and distributed in the ordinary course of business of the insured), and Process Sys. Int'l, Inc. v. The Cont'l Cas. Co., 42 Mass. App. Ct. 560, 562, 678 N.E.2d 866, 867-68 (1997) (same), with Fed. Kemper Ins. Co. v. Jones, 777 F. Supp. 405, 412 (M. D. Pa. 1991) (holding that an exclusion for "goods or products manufactured, sold, handled or distributed" by the insured encompasses only goods sold or distributed in the normal course of business), and Pa. Nat'l Mut. Cas. Ins. Co. v. Kamininsk, 397 Pa. Super. 484, 489-91, 580 A.2d 401, 403-04 (1990) (same). As the parties note, each of these cases has facts which are distinguishable from the instant matter on one ground or another. The court agrees with the Third Circuit in Liberty Mutual Insurance Co. v. Hercules Powder Co., 224 F.2d 293, 296 (3d Cir. 1955), also cited by the parties, that the interpretation of an exclusion "is a situation . . . where comments of [other] courts on language not identical [to that here] cannot help . . . much" because "[u]nless particular words have crystallized into a definite legal rule[,] their meaning necessarily varies with time, place, occasion and the vocabulary of the user."

The exclusion in question does not define "goods or products manufactured, sold, handled or distributed by [plaintiff]." However, the definition of "Insured's Products" encompasses not only "goods" or "products," but also non-tangible items that can form the basis for a products-liability action, such as "warranties or representations made at any time with respect to the fitness, quality, durability, performance or use thereof, or the failure to provide warnings or instructions." (Policy ¶ VIII.I.) Moreover, the title of the exclusion itself is "Products Liability." Cf. Iowa Mut. Ins. Co. v. Fred M. Simmons, Inc., 262 N.C. 691, 696, 138 S.E.2d 512 (1964) ("To interpret the policy provision, it is important to look at the title plaintiff gave to the document it issued."). These factors indicate that the "context" in which the terms of the exclusion should be interpreted is that of a products liability action. When read in that context, "goods or products manufactured, sold, handled or distributed by [plaintiff]" applies only to those items sold or distributed in the normal course of plaintiff's business. See N.C. Gen. Stat. § 99B-1(4) (defining "seller" in a products liability action as an entity "engaged in the business of selling a product"); Restatement (Third) of Torts: Products Liability § 1 cmt. c (1998) (noting that "occasional sales . . . outside the regular course of the seller's business" do not subject an entity to liability, specifically noting that no liability attaches to "an occasional sale of surplus equipment by a business"). The words used in the exclusion have definitions that are amenable to this construction. See Webster's Third New International Dictionary 978 (2002) (defining "goods" as "wares" or "merchandise"); Id. at 2061 (defining "sell" as "to deal in as an article of sale"); Id. at 1027 (defining "handle" as "to trade in" or "to engage in the buying, selling, or distributing of").

For the foregoing reasons, the court finds that the pleadings in the CERCLA Action state facts demonstrating that the alleged injury is covered by the Policy issued by defendant AISLIC to

17

plaintiff Peace College. Moreover, the court finds that the facts alleged in the pleadings in the CERCLA Action do not indicate that any exclusion in the Policy should apply. As such, the court holds that defendants have a duty to defend plaintiff in the CERCLA Action. Accordingly, plaintiff's motion for partial summary judgment (DE # 14) is GRANTED and defendant's motion for partial summary judgment (DE # 18) is DENIED. Defendants have an obligation to reimburse plaintiff for defense costs already incurred in the CERCLA Action, and to assume the expense of plaintiff's defense going forward.

C.   Final Judgment Pursuant to Rule 54(b)

In its complaint, plaintiff seeks a declaration that defendants have a duty both to defend and to indemnify it from the claims lodged in the CERCLA Action as well as any claim made in the future arising from the same facts underlying that suit. However, plaintiff's motion for partial summary judgment requests only a judgment on the duty to defend claim. Accordingly, the court's grant of partial summary judgment to plaintiff adjudicates only one claim among multiple claims alleged by plaintiff.

Under Rule 54(b) of the Federal Rules of Civil Procedure, "[w]hen an action presents more than one claim for relief . . . the court may direct entry of a final judgment as to one or more, but fewer than all, claims . . . only if the court expressly determines that there is no just reason for delay." Certification of a final judgment under Rule 54(b) "is recognized as the exception rather than the norm." Braswell Shipyards, Inc. v. Beazer East, Inc., 2 F.3d 1331, 1335 (4th Cir. 1993). Before certifying a final judgment under Rule 54(b), a court must first "determine whether the judgment is final . . . in the sense that it is an ultimate disposition of an individual claim entered in the course of a multiple claims action." Id. (quoting Curtis-Wright Corp. v. General Elec. Co., 446 U.S. 1, 7

18

(1980)). The court must then "determine whether there is no just reason for the delay in the entry of judgment." Id. This is a case-specific inquiry in which the court considers factors that include:

> (1) the relationship between the adjudicated and unadjudicated claims; (2) the possibility that the need for review might or might not be mooted by future developments in the district court; (3) the possibility that the reviewing court might be obliged to consider the same issue a second time; (4) the presence or absence of a claim or counterclaim which could result in a set-off against the judgment sought to be made final; (5) miscellaneous factors such as delay, economic and solvency considerations, shortening the time of trial, frivolity of competing claims, expense, and the like.

Id. at 1335-36 (citation omitted).

Here, the court concludes that its judgment is final as to the duty to defend claim in that an ultimate disposition as to that claim has been rendered and other claims, specifically the duty to indemnify claim, remain pending. The court also finds that there is no just reason for delay of an entry of judgment as to the duty to defend claim. Judicial economy would be served by certifying final judgment because an appellate decision finding no duty to defend would moot the remaining duty to indemnify claim and end this case. See Penn-America Ins. Co. v. Mapp, 521 F.3d 290, 296 (4th Cir. 2008) (citing Res. Bankshares Corp. v. St. Paul Mercury Ins. Co., 323 F.Supp.2d 709, 723 (E.D. Va. 2004)). Moreover, the duty to indemnify claim cannot be resolved unless and until there is a finding of liability against plaintiff in the CERCLA litigation, which may not occur until trial on issues of liability is held in May 2012. In the meantime, defendants will be required to defend plaintiff in that action, perhaps at substantial cost.

In sum, the court finds that this judgment is final as to the duty to defend claim, and that the interests of judicial economy, the unique relationship between the adjudicated duty to defend and the pending duty to indemnify claim, and equitable considerations such as the delay and substantial

19

economic burdens borne by defendants if this action is not certified dictate that a final judgment be entered under Rule 54(b).

## CONCLUSION

For the foregoing reasons, plaintiff's motion for partial summary judgment (DE # 14) is GRANTED and defendants' motion for partial summary judgment (DE # 18) is DENIED. The Clerk is DIRECTED to issue judgment as to the duty to defend claim only. Finally, where it appears that the duty to indemnify claim cannot be adjudicated until there has been a finding of liability against plaintiff in the CERCLA Action, the parties are DIRECTED to show cause within twenty-one (21) days of entry of this order why further proceedings in this action should not be stayed pending resolution of plaintiff's liability in the CERCLA Action.

SO ORDERED, this the 15th day of September, 2010.

_____
LOUISE W. FLANAGAN
Chief United States District Court Judge